IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

STACY BAKER, )  CASE NO. 1:21-CV-1709
) 
        Plaintiff, )
)
  vs. )  MAGISTRATE JUDGE
)  JONATHAN D. GREENBERG
)
COMMISSIONER OF SOCIAL )
SECURITY, )  **MEMORANDUM OF OPINION AND**
        Defendant. )  **ORDER**

Plaintiff, Stacy Baker ("Plaintiff" or "Baker"), challenges the final decision of Defendant, Kilolo

Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of

Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI")

under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28

U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

On July 8, 2019, Baker protectively filed applications for POD, DIB, and SSI alleging a disability

onset date of February 1, 2018 and claiming she was disabled due to severe low back pain, diabetes,

PTSD, left foot ulcer, abnormal heartbeat, anxiety, and depression.  Transcript ("Tr.") at 236, 545.  The

application was denied initially and upon reconsideration, and Baker requested a hearing before an

administrative law judge ("ALJ").  Tr. 364.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On October 21, 2020 an ALJ held a hearing, during which Baker and an impartial vocational expert ("VE") testified.  Tr. 257-282.  On November 9, 2020, the ALJ issued a written decision finding that Baker was not disabled.  Tr. 236-250.  The ALJ's decision became final on August 12, 2021, when the Appeals Council declined further review.  Tr. 1-4.

On September 2, 2021, Baker filed her Complaint to challenge the Commissioner's final decision. Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 10, 12.  Baker asserts the following assignments of error:

> (1)  Whether the ALJ erred in failing to include Ms. Baker's prescribed quad cane in his residual functional capacity determination.
>
> (2)  Whether the ALJ's rejection of the opinion of Dr. Whitlow, an examining consultant for social security, was based on legal error.

Doc. No. 10, p. 1.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Baker was born in 1971 and was 46 years-old on her alleged onset date.  Tr. 248.  She has at least a high school education and has past relevant work as a home health aide, nurse assistant and polishing machine operator.  Tr. 248.

### B.    Relevant Medical Evidence[2]

In November 2013, Baker injured her back at work and reported pain; a lumbar MRI showed a herniated disc at L3-4 with mild ventral distortion of the dural sac and an L4-5 left paramedian herniation that impinged the epidural fat of the left lateral recess.  Tr. 612, 636.

In March 2016, Baker reported right knee pain and left foot pain.  An x-ray showed mild patellofemoral and tibiofemoral osteoarthritis.  Tr. 1107.  A left heel x-ray showed posterior plantar

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

2

calcaneal spurring.  Tr. 1109.

In June 2016, Baker saw her primary care physician, Angela Brinkman, D.O., for a follow-up of her type-2 diabetes mellitus.  Tr. 1084.  She had a history of depression, which had previously improved with Zoloft, and reported feeling depressed.  Tr. 1084.  She complained of foot pain for the last three weeks but did not want to wear diabetic shoes because she did not like the way they looked and had been wearing flip flops.  Tr. 1084.  Bilateral x-rays of her feet showed a 11-mm plantar calcaneal spur and moderate retrocalcaneal spur on the left and a 10-mm plantar calcaneal spur with a small retrocalcaneal spur on the right.  Tr. 1105.

On March 8, 2018, Baker saw Dr. Brinkman for a follow up.  Tr. 1071.  She reported ongoing back and knee pain since her 2013 work injury, denied depression, and reported some anxiety.  Tr. 1071.  Upon exam her mood and affect were pleasant and appropriate and she had no abnormalities in her low back or legs.  Tr. 1071-1072.  Baker returned on March 30 because her blood sugar was running high and again endorsed chronic low back pain.  Tr. 1068.  Her pain medication (Meloxicam) did not resolve her pain but she was not interested in trying another.  Tr. 1068.

On May 16, 2018, Baker saw Natalie Whitlow, Ph.D., for a consultative exam.  Tr. 619-628. She reported having applied for disability benefits due to her diabetes, knee and back pain and problems, anxiety, and depression.  Tr. 620.  She was working at a nursing home escorting patients to doctor appointments; she made her own schedule and averaged 10-16 hours a week.  Tr. 622.  Upon exam she was disheveled, had a labile and inappropriate affect, and was fully oriented.  Tr. 623-624.  She had difficulty organizing her thoughts, but in general her speech and thought processes appeared to be within normal limits.  Tr. 623.  She exhibited fair to poor insight and poor judgment.  Tr. 625.  She stated that she could manage her finances and Dr. Whitlow concurred.  Tr. 627.  Dr. Whitlow found that Baker had no limitations with understanding and remembering instructions but had limitations carrying out

3

instructions.  Tr. 627.  She had non-disabling limitations in maintaining attention, concentration, and sustaining mental effort but had limitations following through on and completing tasks.  Tr. 627-628. She had no limitations in her abilities to interact appropriately with supervisors and coworkers in a work setting and did have limitations responding to workplace pressures.  Tr. 628.  Dr. Whitlow diagnosed agoraphobia, generalized anxiety disorder, and an unspecified bipolar and related disorder, with psychotic features.  Tr. 625.  Her diagnoses, taken together, caused her to be emotionally unstable, which was the reason for her functional limitations.  Tr. 627-628.

On October 2, 2018, Baker saw Dr. Brinkman for a diabetes follow up.  Tr. 1063.  She reported that her depression and anxiety were stable and that her diabetes was not controlled.  Tr. 1063.  She admitted that she stopped her diabetes medication because it made her blood sugar too low and she was instructed to restart the medication.  Tr. 1063, 1065.

On February 19, 2019, Baker saw Dr. Brinkman for anxiety upon learning that her sister had cancer.  Tr. 1057.  She reported that she had been on Paxil in 2004 but took herself off it for unknown reasons.  Tr. 1057-1058.  Upon exam she was depressed, tearful, and anxious.  Tr. 1058.  Dr. Brinkman assessed mild depression and started her on Lexapro.  Tr. 1061.

On February 22, 2019, Baker went to the emergency room with mild, right-sided, non-radiating low back pain for the past month.  Tr. 841.  She was not taking any medication for her symptoms and her pain increased with movement.  Tr. 841, 844.  Upon exam she had a normal range of motion, no back tenderness other than a discrete area of her back, and a normal mood and affect.  Tr. 843-844.  She was prescribed pain medication and muscle relaxants.  Tr. 844.

On March 14, 2019, Baker saw Jessica Staley, PA-C, at Dr. Brinkman's office for a 3-month follow-up of her diabetes.  Tr. 659.  She endorsed depression and anxiety and stated that she had never started her Lexapro.  Tr. 659.  She was taking her diabetes medication bur rarely tested her blood sugar

4

and did not bring any readings to the appointment.  Tr. 659.  Staley assessed type 2 diabetes mellitus with hyperglycemia, vitamin D deficiency, B12 deficiency, and depression.  Tr. 662-663.  She advised Baker to start taking her Lexapro and get a psych evaluation as Dr. Brinkman had recommended.  Tr. 663.

On May 17, 2019, Baker went to the emergency room for right-sided back pain for the last three days, aggravated by lying flat and turning.  Tr. 891.  Tylenol had not helped.  Tr. 891.  Upon exam she had a normal range of motion and right-sided tenderness and spasm.  Tr. 893.  The physician's assistant's impression was acute right-sided low back pain without sciatica.  Tr. 893-894.  She was given Motrin and Robaxin prescriptions.  Tr. 894.  On May 20, Baker followed up with Dr. Brinkman.  Tr. 1050.  She was tearful when discussing family illnesses.  Tr. 1050.  Upon exam she had mild muscle spasms in the L2-S1 area, decreased range of motion in her lumbar spine, and was depressed, tearful, and anxious discussing family illnesses.  Tr. 1051.  Dr. Brinkman increased her Lexapro dose but Baker said she was allergic to it, so Dr. Brinkman prescribed Wellbutrin XL, advised she continue her Motrin and Robaxin, and referred her to physical therapy.  Tr. 1051-1052.

On May 23, 2019, Baker had a diagnostic assessment at Beacon Health for depression and anxiety.  Tr. 1115.  The evaluator found that Baker met the criteria for PTSD with intrusive memories, flashbacks, psychological distress, avoidance, trouble remembering, negative emotions, anhedonia, trouble having positive emotions, irritability, hypervigilance, exaggerated startle response, trouble concentrating, and sleep disturbance.  Tr. 1124.

On May 26, 2019, Baker went to the emergency room with sharp low back pain radiating to her buttock for the past week.  Tr. 930.  Ibuprofen gave her five hours of relief but she did not take it regularly.  Tr. 930.  Upon exam she had right paralumbar pain and very mild hypertonicity.  Tr. 931.  She was told it was likely a muscle strain.  Tr. 936.  Her discharge notes states, "You should not stay in

5

bed all day and SHOULD try to do your normal daily activities but avoid any strenuous activity or heavy lifting until feeling better." Tr. 936 (emphasis in the original).  On May 30, Baker returned to the emergency room for feeling heart palpitations.  Tr. 950.  She reported feeling stressed due to work and life.  Tr. 950.  Upon exam she had a normal musculoskeletal range of motion and a normal mood, affect, speech and behavior.  Tr. 952.  An EKG was normal except for premature ventricular contractions.  Tr. 953-954.

That day she started physical therapy.  Tr. 789-792.  She reported low back while sitting but her pain didn't increase with longer sitting; walking decreased her back pain but increased her right buttock pain; and standing for long periods increased numbness in her right anterior thigh.  Tr. 790.  Upon exam, she had decreased range of motion with pain in her lumbar spine, positive right straight leg raise testing, and a guarded, compensated, antalgic gait.  Tr. 791.  Long right leg pull and manual lumbar traction decreased her pain.  Tr. 791.

On June 4, 2019, Baker saw Dr. Brinkman for a follow-up after her recent emergency room visit and was feeling better.  Tr. 1046.  Upon exam, she had mild muscle spasms in her L2-S1 area.  Tr. 1047. On June 20, she had a follow-up with Dr. Brinkman for her medications; she had gone to psych and had started Paxil three days prior to her visit.  Tr. 681.  She stated that her counselor wanted her to be off work for three weeks and requested paperwork.  Tr. 681.  She had not gotten her lumbar x-rays; they were taken that day and showed very minimal degenerative spurring.  Tr. 681, 705.  Upon exam, she had mild paraspinal muscle spasms in her L2-S1 area and a small ulcer on her left great toe.   Tr. 682.  She had a depressed affect and a pleasant mood.  Tr. 682.

On June 18, 2019, Baker had a counseling session and reported heightened depressive symptoms, she did not feel like doing anything, and she felt like she would never be happy again.  Tr. 1162.  Her work environment triggered her unresolved feelings of the loss of her mother two years prior

6

and she became tearful when discussing that and admitted that she experienced occasional passive suicidal thoughts.  Tr. 1162.

On July 15, 2019, Baker saw Physician's Assistant Staley for a diabetes follow-up.  Tr. 653.  She reported taking her Paxil and not having had anxiety attacks since she started it.  Tr. 653.  She had not been testing her blood sugar regularly and did not bring any readings in.  Tr. 653.  Staley added a BMI of 38 to 38.9 to her assessment list.  Tr. 656.  On July 24 Baker saw Dr. Brinkman for a physical exam and paperwork.  Tr. 1036.  Her musculoskeletal examination was unremarkable.  Tr. 1037.

On July 18, 2019, Baker saw Salim Hayek, M.D., for low back pain made worse by physical activity and lifting.  Tr. 636.  Upon exam, she had a positive straight leg raise testing on the right.  Tr. 638.  Dr. Hayek's impression was low back pain and right sided lumbar radiculopathy in an L3 distribution and he diagnosed lumbar radiculitis.  Tr. 638.  He recommended injections, physical therapy, and exercise.  Tr. 638.

On August 13, 2019, Baker had a counseling appointment.  Tr. 722.  She still felt sad, hopeless, and worthless and had excessive worries, restlessness, and lack of concentration, but all those symptoms had improved and she was feeling better.  Tr. 722.  Counselling was helping, she had had only one panic attack in the past month, and she was sleeping well.  Tr. 722, 719.  She denied medication side effects and her Paxil dosage was increased.  Tr. 722.

On August 26, 2019, Baker attended physical therapy for her fourth visit after having not attended since July 3.  Tr. 783.  She stated that home exercises relieve her pain when she did them.  Tr. 783.  She reported right thigh numbness when standing more than 30 minutes that resolved when she sat down.  Tr. 783.  Upon exam she had decreased range of motion with pain in her lumbar spine, positive right straight leg raise testing, and long right leg pull decreased her pain.  Tr. 783.

On September 5, 2019, Baker had a counseling appointment.  Tr. 748.  She complained of

7

fatigue and stated that she will take a 1 or 2-hour nap in the afternoon; she felt groggy since her medication was increased.  Tr. 748.  On September 18 she stated that she was still tired.  Tr. 751.  She enjoyed seeing her grandchildren and watched them about once a week.  Tr. 751.  On October 15 she reported somewhat decreased depression, her medication dosage had been reduced, and she had gone out a few times with her family and continued to look after her aging father.  Tr. 753.

On October 23, 2019, Baker saw Staley for a 3-month follow-up; her diabetes had significantly improved over the past 6 months.  Tr. 643, 645-646.

On December 10, 2019, Baker had a counseling appointment and reported having four anxiety attacks in the past month, feeling down, and having problems with concentration and motivation due to her physical problems and her sister being sick.  Tr. 739.  She declined a medication adjustment.  Tr. 739.

On December 11, 2019, Baker saw Simone Majetich, D.O., at her primary care office reporting low back pain and her legs going numb.  Tr. 1483.  Upon exam she had mild tenderness to palpation of her lumbar paraspinal muscles bilaterally with some hypertonicity and reported pain with all range of motion.  Tr. 1483.  She had negative straight leg raise testing, full strength, an antalgic gait, decreased sensation in her right thigh, and an appropriate mood and affect.  Tr. 1483.  Dr. Majetich prescribed a quad cane for 90 days, referred her to physical therapy and pain management, and recommended supportive care (rest, ice, heat, and Tylenol).  Tr. 794, 1484.

On December 26, 2019, Baker visited pain management.  Tr. 1413.  Upon exam she had lumbar tenderness, right greater than left; positive right straight leg raise testing; positive facet loading on the right; and decreased reflex on the right.  Tr. 1414.  Her mental exam findings were normal.  Tr. 1412-1413.  An injection for her low back pain and mild medication management was discussed but Baker

was very hesitant.  Tr. 1413.  The impression was radiculopathy and an MRI and EMG were ordered.
Tr. 1413.

On January 15, 2020, Cheryl Wilson, LPCC, completed a mental capacity assessment on Baker's
behalf.  Tr. 1018-1019.  Wilson opined that Baker had moderate, major depressive disorder and PTSD,
causing marked restrictions in multi-step activities, working at an appropriate and consistent pace,
completing tasks in a timely manner, and sustaining an ordinary routine and regular attendance at work.
Tr. 1018-1019.

On January 23, 2020, Baker saw Michelle Godek, Ph.D, and Jamie Hart, PT, for a Key
Functional Whole Body Assessment.  Tr. 1374-1379.  She rated her pain as 10/10 and the examiners
stated that she gave full effort and that the testing was valid.  Tr. 1374.  She could not bend over without
pain and was unable or unwilling to do some of the exercises because she was afraid her pain would
increase.  Tr. 1374.  She did not lift bilaterally for any of the activities but did attempt to try with her left
hand while her right hand was on her cane.  Tr. 1374.  She was able to toe walk but used a cane in her
right hand and discontinued after one foot.  Tr. 1376.  She maintained balance but did not perform heel
walk.  Tr. 1376.  Overall, she walked with small, equal steps while holding a cane in her right hand, she
leaned to the right when she walked, and she had a left hip hike.  Tr. 1376.  On her way back down the
hallway she held onto the wall with her left hand and held her cane in her right hand.  Tr. 1376.  She
leaned against the wall to take a break before finishing her gait task.  Tr. 1376.  She stopped climbing
after 3 steps due to back pain and used a cane in her right hand while she held the handrail with her left
hand.  Tr. 1376.  The examiners found that Baker could only work 2-3 hours a day.  Tr. 1375.  She could
occasionally lift, push and pull up to 4.5 pounds and carry 3.1 pounds; sit 1-2 hours total, 30 minutes at a
time; walk 2-3 hours total, occasional moderate distances at a time; and she could not stand at all.  Tr.
1375.  She could perform occasional grasping and neck movements and no postural activities.  Tr. 1375.

9

On January 31, 2020, Baker went to the emergency room for a flare-up of low back pain.  Tr. 1387.  She had not started her Neurontin because she was afraid to take it.  Tr. 1387.  Upon exam she had lumbar tenderness, pain and spasms and a normal range of motion in her hips and thoracic and lumbar spine.  Tr. 1389.  She had intact sensation and motor functioning, intact reflexes, absent Babinski's sign on the left, and normal mental status findings.  Tr. 1389.  She was told to follow-up with her physical therapist and pain management and to take ibuprofen, Tylenol, and Flexeril.  Tr. 1390-1391.

On February 7, 2020, Baker saw Dr. Majetich for a monthly checkup for bariatric classes.  Tr. 1473.  Upon exam she moved all extremities equally and walked with a cane, she had an intact neurological exam, and an appropriate mood and affect.  Tr. 1473.

On February 20, 2020, Baker saw Dr. Whitlow for a second consultative exam.  Tr. 602-611. She reported she could not work due to depression caused by past trauma, anxiety, low back pain, and knee arthritis.  Tr. 603.  She explained that she was noncompliant with her medication because her depressive symptoms were so severe she will forget to take it, and she feared side effects of medications. Tr. 605.  She reported alcohol abuse with drinking three fifths of liquor every other weekend as a form of self-medication for her mental health symptoms.  Tr. 605.  Upon exam, she was disheveled and her affect was flat and depressed.  Tr. 606-607.  At times during the evaluation she exhibited difficulty organizing her thoughts well enough to effectively communicate them.  Tr. 607.  Dr. Whitlow diagnosed major depressive disorder, severe, with anxious distress.  Tr. 608.  She concluded that Baker's mental health prognosis was poor.  Tr. 609.  She could manage her finances if awarded benefits.  Tr. 610. There was no evidence to support a conclusion that she had debilitating limitations with understanding and remembering instructions but her diagnoses caused limitations carrying out instructions.  Tr. 610.

10

She had limitations in maintaining attention, concentration, persistence and pace, responding appropriately to coworkers and supervisors, and responding to work pressures.  Tr. 611.

On March 6, 2020, Baker had a lumbar MRI that showed a "questionable very tiny tree disc fragment posterior to the lower L2 vertebrae to the right of midline with only very slight left anterior thecal sac flattening, a small paramedian disc herniation and caudal extrusion at L3-4 causing very slight left anterior thecal sac flattening, mild left bulging at L4-L5, and a very tiny bulge at L5-S1.  Tr. 1501-1502.

On March 17, 2020, Baker saw a physician's assistant at her pain management office to review her imaging.  Tr. 1409.  She rated her pain as 6/10.  Tr. 1409.  Upon exam she had functional range of motion in her low back but it was limited due to pain, diffuse lumbar tender points, negative straight leg raise testing, 5/5 motor function, normal sensation and reflexes, a normal gait, an ability to toe walk and an inability to heel walk.  Tr. 1502.  The PA assessed lumbar radiculopathy and right knee pain.  Tr. 1502.  He refilled her gabapentin and stated that she should be more consistent in taking it.  Tr. 1410. He wrote that her symptoms were intermittent and she would benefit from continuing aquatic physical therapy and, possibly, an epidural injection.  Tr. 1410.

On April 7, 2020, Baker had a telemed visit with Dr. Majetich to discuss her anxiety and depression.  Tr. 1629.  She reported speaking to her counselor once a week.  Tr. 1629.  Her Paxil was making her calmer but she was still having excessive sadness; she needed to contact her psychiatrist regarding her medication and planned to do so soon.  Tr. 1629.  Dr. Majetch assessed severe major depression and recommended she contact her psychiatrist about increasing her medication.  Tr. 1631.

On April 14, 2020, Baker returned to Dr. Majetich for a urinary tract infection and left flank pain that occurred three days prior.  Tr. 1624.  She admitted that she was not taking her gabapentin regularly as prescribed by her pain management specialist; she took it occasionally and was not taking anything

11

for her current pain.  Tr. 1624.  Upon exam, she had left lumbar paraspinal hypertonicity with tenderness to palpation over the muscle body, no spinal point tenderness, a normal gait and neurological exam, and an appropriate mood and affect.  Tr. 1626.

On April 16, 2020, Baker had a telemed medication management appointment.  Tr. 1434.  She was feeling alright, Paxil was calming her more, and she had occasional anxiety attacks.  Tr. 1434.  She worried about her family's medical problems, her own medical problems, and she still felt depressed sometimes.  Tr. 1437-1438.  Upon exam she was alert and fully oriented, had intact attention and concentration, and a friendly and cooperative demeanor.  Tr. 1439.

On May 30, 2020, Baker had a sleep study due to her complaints of trouble sleeping, fatigue, waking with a choking sensation, and losing track of a topic during conversation.  Tr. 1677.  The polysomnography showed sleep apnea with severe oxygen desaturations.  Tr. 1678.

On August 18, 2020, Baker had a telemed medication management appointment.  Tr. 1719.  Her sleep was okay and she was using her CPAP machine.  Tr. 1719.  Her depression had worsened; her father was in hospice and her sister's cancer was terminal.  Tr. 1722.  She was taking less Paxil than prescribed.  Tr. 1722.  She reported not having any serious anxiety attacks and "cried only once last week."  Tr. 1723.  On August 25 she had a telemed counseling appointment and stated that she was recently engaged.  Tr. 1731, 1733.  She discussed her father's upcoming funeral and her thoughts that her sister would pass away in the near future.  Tr. 1733.

## C.     State Agency Reports

On November 11, 2019, Bruce Mirvis, M.D., reviewed Baker's record and found that she could lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand or walk for 6 hours in an 8-hour workday; and occasionally climb ladders, ropes, scaffolds, ramps, and stairs and stoop, kneel, crouch, and crawl.  Tr. 294-296.  On April 13, 2020, Steven McKee, M.D., reviewed Baker's record and

agreed.  Tr. 333.

On November 9, 2019, Joseph Cools, Ph.D., reviewed Baker's record and found that she could perform short-cycle, simple, routine and repetitive tasks and have superficial interaction with supervisors, coworkers, and the general public.  Tr. 296-298.  On April 10, 2021, Robyn Murry-Hoffman, Psy.D agreed with Dr. Cools but added that Baker could perform routine work with infrequent changes explained in advance.  Tr. 334-335.

## D.    Hearing Testimony

During the October 21, 2020 telephonic hearing, Baker testified to the following:

- She lives alone and her adult children live nearby and help her a lot.  Tr. 264-265.

- When asked to describe why she felt she was disabled, she explained that she was injured at work in 2013 and has had problems with her low back, legs and knees since then.  Tr. 269. She can't stand for more than 30 minutes.  Tr. 269.  Her leg will go numb.  Tr. 269.  Her back pain is sharp and throbbing and she can't concentrate.  Tr. 269.  Walking is the same; her right leg goes numb.  Tr. 272.  She can sit for about 20 minutes and she has to pull herself up.  Tr. 273.  She can lift a gallon of milk, but she won't carry it around because she is scared of her back.  Tr. 273.  Her past work in nursing homes is too extreme for her.  Tr. 269.  She takes medications and they help sometimes but not all the time.  Tr. 269-270.  She takes muscle relaxants and gabapentin, "Ibuprofen, sometimes, Tylenols, gel."  Tr. 270.

- She also has mental health issues, takes medication, and has counseling every two weeks. Tr. 270.  Her medication helps sometimes but sometimes it does not.  Tr. 271.  She gets depressed because she can't get out and work like she used to.  Tr. 271.

- When asked if she ever uses a cane, she stated that she has a quad cane that Dr. Majetich prescribed.  Tr. 272.  She uses it all the time.  Tr. 272.  She is scared she is going to fall.  Tr. 272.

- When asked if she believed she would have trouble learning a job, she stated, "it depends." Tr. 273.  She could not relearn her STNA job now due to her problems with concentration. Tr. 273-274.  She doesn't have problems following instructions but she sometimes has memory problems and she forgets things.  Tr. 274.  She doesn't have problems getting along with people on the job.  Tr. 274.

The VE confirmed that Baker's past relevant work was as a home health aide, nurse assistant, and polishing machine operator helper.  Tr. 277.  The ALJ asked the VE whether a hypothetical individual with the same age, education, and work experience as Baker could perform Baker's past work

or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 278. The VE answered that such an individual could not perform Baker's past work but could perform the following representative jobs in the economy: merchandise marker, cleaner housekeeper, and cafeteria attendant. Tr. 278-279. When asked whether her answer would change if the individual needed a cane for ambulation, the VE stated that such an individual could not perform light work. Tr. 279.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§

14

404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.  The claimant has not engaged in substantial gainful activity since February 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq*. and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: degenerative disc disease; diabetes mellitus; obesity; major depressive disorder; and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; can carry out short-cycle tasks in a routine work setting with few changes; can respond

appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace; and the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on September **, 1971 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 238-249.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip*

16

*v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D.

17

Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. The ALJ did not err when evaluating Baker's use of a cane

Baker argues that the ALJ "failed to properly analyze Ms. Baker's use of a cane, and the impact on her residual functional capacity." Doc. No. 10, p. 11. "[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work." *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D.Tenn. March 6, 2013) (citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002)); *Cruz-Ridol Carreon v. Comm'r of Soc. Sec.*, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018), *report and recommendation adopted*, 2018 WL 1083252. To be considered a restriction or limitation, a cane "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary," *i.e.*, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a cane." *Murphy*, 2013 WL 829316, at *10 (internal citations omitted). "If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE." *Id*. In general, an ALJ's finding that a cane or other assistive device is not medically necessary is error when the claimant has been prescribed an assistive device and the ALJ did not include the use of the device in the RFC assessment without providing an explanation for the omission. *Cruz-Ridolfi*, 2018 WL 1136119, at *15 (quoting *Watkins v. Comm'r of Soc. Sec.*, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017)); SSR 96-9P, 1996 WL 374185, at *7 (July 2, 1996) ("To find that a hand-held assistive

device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)").

Here, the ALJ remarked that Baker had testified that she used a prescribed quad cane at all times due to her fear of falling.  Tr. 242.  He observed that during her functional capacity evaluation in January 2020 she used a cane held in her right hand, she could toe walk but stopped after one foot, and otherwise she walked with small, equal steps holding her cane.  Tr. 243.  The ALJ commented that at a pain management visit in May 2020 she had negative straight leg raise testing, full strength in her lower extremities, normal sensation, and a normal gait.  Tr. 244.  There was no mention of her using a cane.  Tr. 244.  She was able to toe walk and unable to heel walk due to a "pulling down" sensation in her lower extremities.  Tr. 244.  The ALJ concluded,

> The record does not demonstrate the significantly limited range of motion, muscle weakness, muscle atrophy, sensation loss, or reflex abnormalities that are associated with intense and disabling pain (Ex. 12F/8, 14F/9, 14F/2). Imaging of the claimant[']s lumbar spine revealed mild findings (Ex. 5F/76, 17F/44). Although the claimant has received treatment for her degenerative disc disease, the treatment has been essentially routine and/or conservative in nature. The undersigned notes the claimant was prescribed a quad cane in December 2019 (Ex. 17F/27). The claimant used the cane [at] some appointments; however, she was not using the cane during subsequent exams where she displayed normal range of motion in the lower extremities, normal gait, and was able to toe walk without use of a cane (Ex. 11F/2, 17F/16, 14F/9, 12F/10).

Tr. 247.

Baker contends that the ALJ's reasoning that she did not use her cane "at all subsequent examinations and due to some normal findings on some examinations" is "legally insufficient" and cites SSR 96-9p in support.  Doc. No. 10, p. 12.  But SSR 96-9p does not say that an ALJ may not rely on objective exam findings when evaluating the use of a cane.  *See* SSR 96-9p, 1996 WL 374185, at *7 ("The adjudicator must always consider the particular facts of a case."); *see also Phillips v. Comm'r of*

*Soc. Sec.*, 2021 WL 5603393, at *10 (N.D. Ohio Nov. 30, 2021) (the ALJ's "explanation that the objective medical findings did not support a need for a cane demonstrated that the ALJ properly considered whether a cane was medically necessary.").  Moreover, SSR 96-9p states that "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)" to be medically required.  1996 WL 374185, at *7.  But when Dr. Majetich prescribed a quad cane in December 2019, he prescribed it for 90 days and provided no circumstances for which it was needed.  Tr. 794, 1484.  Thus, the Court finds that Dr. Majetich's quad cane prescription is not "medical documentation establishing" that her need for a cane was "medically required" per SSR 96-9p.

In support of her argument that a cane was medically necessary, Baker cites her March 2020 lumber MRI (Doc. No. 10, p. 13), but the ALJ discussed that MRI and accurately described the findings as mild.  Tr. 244, 247.  Baker cites her testimony that she used a quad cane (Doc. No. 10, p. 12) but the ALJ found that her description of her symptoms and limitations were inconsistent with the record (Tr. 247), a finding that Baker does not challenge.  Moreover, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a cane."  *Murphy*, 2013 WL 829316, at *10.  Baker cites her functional evaluation in which she used a cane, but the ALJ described that evaluation and stated, with accuracy, that 3 months later Baker did not use a cane and had a normal gait, full strength, intact sensation, and negative straight leg raise testing.  Tr. 244.  *See, e.g., Ross v. Comm'r of Soc. Sec.*, 2018 WL 580157, at *6 (S.D.Ohio Jan. 29, 2018) (substantial evidence supported the ALJ's finding that a cane was not medically necessary when the claimant's cane use was inconsistent), *report and recommendation adopted*, 2018 WL 1406826; *Phillips*, 2021 WL 5603393, at *10.

Finally, the ALJ discussed Baker's lumbar spine impairment.  The ALJ recognized that Baker

20

had had exam findings showing tenderness, muscle spasms, decreased sensation, and reduced range of motion.  But the ALJ observed that Baker had also had unremarkable exam findings, her imaging results were mild, and her treatment was routine and conservative.  Tr. 242-244, 247.  Thus, the ALJ did not "cherry-pick" the evidence or fail to reconcile his findings, as Baker alleges.

In sum, the Court finds that the ALJ did not err when evaluating Baker's use of a cane.

## B. The ALJ did not err when evaluating Dr. Whitlow's opinion

Baker argues that the ALJ erred when rejecting Dr. Whitlow's opinion because his explanation— that Dr. Whitlow did not specify Baker's functional capabilities—is inaccurate.  Doc. No. 10, pp. 15-16.

The ALJ found that Dr. Whitlow's May 2018 opinion that Baker had "limitations" in four areas of functioning was unpersuasive.  Tr. 245.  The ALJ wrote that he agreed that Baker had limitations in the noted areas (and that such a finding was supported by Dr. Whitlow's exam) but explained that Dr. Whitlow's opinion "does not cite specific limitations in the areas and is vague as to the claimant's functional capabilities."  Tr. 245.  The ALJ wrote that Dr. Whitlow's February 2020 opinion that Baker had "limitations" in the four areas of functioning and "diminished ability" coping and tolerating interpersonal stressors resulting in Baker "often responding in aggressive, withdrawing or other inappropriate ways" was "[a]gain…unpersuasive because the limitations do not specify the claimant's functional capabilities."  Tr. 245-246.  Baker submits that Dr. Whitlow did specify her functional capabilities "particularly in light of the doctor's finding that Ms. Baker is unable to adequately carry out instructions, will often respond to typical interpersonal stressors with aggression, withdrawal or other inappropriate actions, and fails to be emotionally stable enough to present in a professional manner and interact in socially appropriate ways."  Doc. No. 10, p. 16.

Dr. Whitlow stated that Baker "appears to have limitations with carrying out instructions, which is evidence by her MDD with Anxious Distress diagnosis that has accompanying symptomology that

diminishes her levels of motivation and drive and result in her not adequately carrying out instructions."

"Not adequately carrying out instructions" is not a specific description of Baker's functional capabilities.

Dr. Whitlow's description of how Baker will often respond to interpersonal stressors is also not a

specific description of Baker's functional capabilities.  The ALJ relied upon the state agency reviewers'

opinions setting forth specific functional capabilities and, as a result, limited Baker to short-cycle tasks

in a routine work setting with few changes, the ability to respond appropriately to supervisors,

coworkers, and work situations if the tasks performed are goal-oriented, not at a production rate pace,

and do not require more than superficial interaction (no negotiating, instructing, persuading, or directing

the work of others).  Tr. 241, 246.  Thus, the ALJ's RFC accounted for Baker's limitations in carrying

out instructions and responding to others and work pressures.[3]  The Court finds that the ALJ did not err

when evaluating Dr. Whitlow's opinion.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED.**


Date: May 16, 2022                                    *s/ Jonathan Greenberg*
                                                       Jonathan D. Greenberg
                                                       United States Magistrate Judge

---

[3] Baker cites *Lovejoy v. Comm'r of Soc. Sec.*, 2019 WL 366687, at *9 (N.D. Ohio Jan. 30, 2019) in support of her argument. Doc. No. 10, p. 17, n.4.  In *Lovejoy* the court reversed because the ALJ did not "evaluate, much less acknowledge" the statements made by the provider and the only explanation the ALJ provided for assigning the opinion little weight was that it was "inconsistent with the record."  Here, the ALJ acknowledged Dr. Whitlow's statements and explained why he did not find them persuasive.  Thus, it is clear to a subsequent reviewer why the ALJ rejected Dr. Whitlow's opinions.